STATE OF IOWA, Appellee, v. A. L. WILSON, Appellant.

**CONTINUANCE:** Admission to Avoid—Effect. The State, after admitting that a named person would, if present, testify to certain alleged facts, as recited in an affidavit for a continuance, may not, under any circumstances, show by cross-examination, or assert in argument: (1) That such person is a myth; or (2) that, if he is not a myth, he would not, if present, testify as the State has admitted he would testify.

The State may, however, always show that the *statements* or *matters* to which the absent witness would testify, if present, *are not true.*

*Appeal from Mahaska District Court.*—CHARLES A. DEWEY, Judge.

NOVEMBER 14, 1922.

REHEARING DENIED APRIL 3, 1923.

INDICTMENT for assault with intent to commit murder. A verdict of guilty of assault with intent to commit manslaughter was returned, and sentence rendered thereon. The defendant has appealed.—*Reversed and remanded.*

*O. C. G. Phillips, David S. David,* and *McCoy & McCoy,* for appellant.

*Ben J. Gibson,* Attorney General, *John Fletcher,* Assistant Attorney General, and *Maxwell A. O'Brien,* County Attorney, for appellee.

EVANS, J.—I. The date of the assault was December 2, 1920. The person assaulted was Mrs. Bollinger-Wilson, the recently divorced wife of the defendant. The assault, if made, was made with a deadly weapon, a revolver, from which two shots were discharged in the direction of the said Mrs. Bollinger-Wilson.

The defendant has filed a brief of 130 pages, which in its form has quite ignored our rules. Excellent in many respects, and indicating much faithful labor on the part of counsel, it is, nevertheless, much impaired in its usefulness to us by its

undue length and by the multiplicity of its points,—too many of which are not well taken,—and by the fact that it is not orderly in the presentation of its subjects. The brief presents a very extensive argument upon the merits of the case upon the evidence, the contention being that the evidence is not sufficient to sustain a conviction, and that a verdict ought to have been directed. The point is not well taken. The evidence is sufficient to warrant its submission to the jury.

II. One of the assignments of error relates to the cross-examination of the defendant in relation to an affidavit made by him in support of a motion for continuance, and to statements made to the jury by counsel for the State impeaching such affidavit. This assignment presents, in our judgment, the most serious question of error in the record. The alleged assault was made in a store, about 6 o'clock P. M., in the presence of several persons, all of whom were known to the defendant, except one, and all of whom, except one, were named by defendant in his direct testimony. This "traveling man" was described as being in conversation with "Miss Bernstein." At the trial term, the defendant presented a motion for continuance, based upon the absence of a material witness, one C. W. Kerner. The defendant filed his affidavit in support of such motion, setting forth the facts to which he expected the absent witness to testify. Such affidavit was, in part, as follows:

"That the said C. W. Kerner, if present, would testify that he was in the said room of the Bollinger Jewelry Store on West High Avenue at the time of the said alleged assault; that he, if present, would testify that he did not see the said A. L. Wilson draw a gun from his pocket, covered with a handkerchief, and point the same at the said Mary Bollinger Wilson. That he did not hear any gun snapped while the said Mary Bollinger Wilson was standing talking to the said A. L. Wilson, and did not see the said A. L. Wilson flourish or draw a gun from his pocket and point the said gun at the said Mary Bollinger. That he did not see the said A. L. Wilson run towards the vault, as the said Mary Bollinger Wilson ran into the vault; that he did not see or hear him shoot at or toward the said vault after the said Mary Bollinger Wilson went into the said vault. That he did not see the said A. L. Wilson attempting

to open the said vault doors.  That he heard the two shots fired after the witness Dean had come out of the vault, and after he had started to scuffle with the said A. L. Wilson.  That he did not hear any loud talk between the said A. L. Wilson and Mary Bollinger Wilson, or hear the said A. L. Wilson declare: 'You won't, won't you? you won't, won't you?' in a loud voice.''

As a witness upon the trial, the defendant's testimony was consistent with the recitals of his affidavit as to what he expected to prove by the witness Kerner.  On cross-examination of the defendant, he was confronted by counsel for the State with this affidavit, and the following examination was pressed by counsel and permitted by the court, over appropriate objections made by defendant's counsel:

''Q.  Now you have testified that you never have talked to C. W. Kerner or any traveling man about this transaction, since December 2, 1920, or before.  Now, in this affidavit, you say that you can prove these facts that you have set forth here by C. W. Kerner, if he were personally present?  A.  I think that, if he were here,—yes, he would testify to that.  Q.  But you have told the jury that he wasn't present, haven't you?  A.  I say that he would testify to that if I could find him.  Q.  I will ask you to be certain.  I want to get this definite.  You did testify on direct examination, and already on cross-examination, that the only people present in the store, that evening of December 2, 1920, were Helen Harriman, Floyd Dean, Mrs. Bollinger, Miss Bernstein, and a traveling man or someone with her, have you not?  A man that you did not know?  A. When I said the traveling man, I mean the gentleman that is included in this paper.  Q.  How did you know it was C. W. Kerner, if you were correct when you said that you didn't know who it was, to this jury?  A.  I know that he was a traveling man.  Q.  Read the question.  A.  Well, his appearance—from his appearance I thought he was a traveling man.  Q.  How did you know his name?  A.  I am not just sure about his name; but to the best of my knowledge, that is his name.  Q.  From whom did you get his name—C. W. Kerner?  Mr. McCoy: From his attorneys, if you want to know.  Mr. Phillips: He didn't get it.  We got it.  A.  I don't know just where I got the name or how I got it, but I got it.''

On redirect examination, the following is made to appear:
"Through my attorneys I made the investigation so as to find out in regard to Mr. Kerner that was in the store there at that time. I saw him there. I knew that he was where he could see everything that transpired, and that was the basis of my affidavit in this case. Personally, I don't know his name yet. I had been advised by my attorneys that his name was Kerner. I know how his attorneys obtained his name. Q. How was that obtained, as you were informed? (State objects, as hearsay, incompetent, and irrelevant and immaterial. Sustained, and defendant excepts.) Q. Were you informed, before making this affidavit, that your attorneys had gone to the records at the Downing Hotel, and found that the only man there from New York was named Kerner? (State objects, as incompetent, irrelevant, immaterial, self-serving declaration, and a mere conclusion.) Q. Had you been informed that Miss Bernstein, the lady that he was in there with that evening, had said that he lived in New York City? (Same objection, and hearsay. Sustained, and defendant excepts.)"

Pursuant to such cross-examination, the counsel for the State made the following statements to the jury:

"Now, he says there was a man in there with a girl at the time,—with Miss Bernstein,—named Kerner; and he makes an affidavit here, that is admitted in evidence, trying to get a continuance,—trying to have this case continued,—in which he states that he personally knows that this man Kerner is going to testify to the facts set out in this affidavit; and yet he tells you, gentlemen, that he doesn't know Kerner, doesn't know where he lives, doesn't know anything about him, doesn't know where he got the name Kerner,—that he thought he was a traveling man from the looks of him. He saw him in the store, and sized him up as a traveling man. Never talked to him before,— no reason to believe he had ever met him; never talked to him before or after this crime was committed; and yet he tells you that he is going to testify to all these facts here set out in an affidavit for a continuance, to which he solemnly swears, as he did on the witness stand here about a lot of this other bunk. He solemnly swears this man will swear to these things. And as an afterthought, he comes back here this morning and tried

to explain to you that, after testifying that he didn't know how he got this man's name, that he got the man's name through his attorneys. It was no afterthought, gentlemen, that came into his mind after he had been pinned down on the proposition here that showed that he had deliberately made a false affidavit.''

Other counsel for the State made the following argument to the jury:

''Now, I want to talk to you about 'Mr. Shadow.' That gentleman should be named Mr. Shadow. That would have been very appropriate. Such a person never lived, never breathed, never walked upon the earth. When they were trying to get a continuance here, they had this man here make solemn oath to the following: (Here reads affidavit attached to motion for continuance.) If this man came here and testified to what Wilson said he would, then Wilson is the biggest liar that ever walked. 'The said Kerner resides in New York City, or did so reside a short time before this case was called for trial.'

''Mr. Wilson, upon the witness stand, said positively that he never saw the man before or since, and didn't know anything about his name, didn't know what part of the store he was in when the trouble happened; and when I tried to get him to locate this fellow, his attorneys bobbed up, and they took the responsibility for all of it. I just want you to bear in mind that, when we chased A. L. Wilson to his hole, they said: 'We got that up; we are the fellows that told him about Kerner.' They told the truth that time, gentlemen, and we suspected it all the time. This man, the defendant here, never dreamed of Kerner until he was told to. Now they say they are the fellows that did it, and went down here and looked at the hotel register, and they found a man registered by the name of C. W. Kerner, and his address was New York, and they supposed he was in that store that evening. Isn't that pretty thin stuff for a bunch of attorneys to put up before 12 men? A Mr. Shadow-man, a man who registered at the Downing Hotel whose address is New York City? And this man Wilson has solemnly sworn that he knows whereof he speaks, and that this man Shadow would testify so and so if he was here; never talked to him, didn't know what he would swear to, and the only way he knew anything about the name 'Kerner' was from the hotel register. That is

the frame-up. Brother Hugh Ben talked about me distorting the evidence. If you catch me at it, call me down. I don't know what you would call that,—I would call that making evidence, not distorting it. That is a clear case of making evidence. We say there is no such man.''

It is doubtless true that, if the testimony of the defendant upon the witness stand was inconsistent with an affidavit that he had made, it was proper to impeach his testimony as a witness by confronting him with his affidavit. But counsel for the State had no right to impeach or attack the *affidavit* in support of the motion for a continuance. The State had avoided a continuance by admitting that the witness named in the affidavit would testify as stated in the affidavit. The sufficiency of the motion and the showing in support thereof presented a question wholly for the court, and not for the jury. After the State had admitted before the court that the witness would testify as therein stated, it was not proper to deny it before the jury. There was no inconsistency between the defendant's testimony and his affidavit, in the recital of facts. This being so, the record discloses no legitimate reason why the defendant should have been cross-examined at all, upon the recitals of the affidavit. The real purpose of the examination was reflected later in the argument, and it was not legitimate. Furthermore, inasmuch as the cross-examination had been permitted, and was an attack upon the integrity of the affidavit and the good faith of the defendant in making the same, we see no legitimate reason why the objections to the redirect examination should have been sustained. The manifest purpose of the same was to show that, in applying the name ''C. W. Kerner'' to the ''traveling man'' whom the defendant did not know, he had acted in good faith, upon credible information and belief. Counsel for the State were permitted to challenge the existence of the witness, and to deny before the jury that any witness would ever testify to the recitals of the affidavit. This was clearly improper, and necessarily of great prejudice to the defendant. The authorities on this question are collated in 16 Corpus Juris, Section 864. The following from the text is a fair *résumé* of the holdings of the collated cases:

''Where a continuance is denied on account of an admis-

sion by the State that the absent witness, if present, would testify as stated in defendant's affidavit for a continuance, such affidavit should be read and treated in all respects as the deposition of the absent witness; and when the affidavit is so admitted, its authenticity cannot be questioned at the trial, but must be accepted as if it were the duly signed and certified deposition of the identical witness named. However, such testimony is placed on the same footing as that of witnesses who are present, and therefore may be contradicted, discredited, or its truth controverted by other evidence. But it is reversible error to permit the State to prove that the witness would not, if present, and orally testifying, make the statements attributed to him by the affidavit; or that such witness is nonexistent. So, too, after an admission of the affidavit as testimony, it is error to permit the State to make a showing as to defendant's lack of diligence, or to show that defendant had good reason to believe, if the witness were present and gave such testimony, it would be untrue, or that the absent witness was not introduced by the defense on a previous trial.''

See, also, *State v. Shannehan,* 22 Iowa 435. We are not saying that the State was bound to concede the truth of the recitals. The recitals had the effect of a deposition. The truth of the recitals was subject to contradiction by other evidence. But it was not permissible to the State to prove or claim that the witness was nonexistent, or that, if present, he would not have testified as recited.

The error thus committed is too substantial and prejudicial to be ignored.

We do not overlook the fact that the trial court included an instruction to the jury on the subject of the evidence of this absent witness. The instruction was quite general and proper, as far as it went. It did not purport to correct any errors made by the admission of evidence or by improper argument of counsel.

For the error here indicated, it is our conclusion that a new trial must be granted. The judgment below is, accordingly, reversed.—*Reversed and remanded.*

Stevens, C. J., Arthur and Faville, JJ., concur.